## State v. Mark Shinborn & al.

A witness, hearing the sound of a carriage as it started, may state from what point it appeared from the sound to start, although not seen by him.

An expert may testify that entries upon hotel registers, which he had seen and examined, were in the handwriting of the person who wrote certain other signatures which were produced and proved, or admitted, to be the respondent's, although such entries were not before the jury, they having been destroyed by the respondent himself, for the purpose of suppressing the evidence.

The testimony of an expert may be received to prove a signature by comparison, although there has been no evidence from any person acquainted with such signature.

Entries upon books of third persons of their daily transactions, made by persons whose duty it was to make them, and who testify to their correctness when made, but who have now no remembrance of the transactions, are competent to be read in evidence.

It is no objection to the admission of such entries, that they were first entered upon a slate by two persons during the day, and at night copied by one of them into the books, provided the original entries and copying are verified by the parties making them.

INDICTMENT. The indictment alleged that defendants in the night time did break and enter the store of one Aldrich, with intent to steal the goods and chattels of said Aldrich, and that they did steal, &c.

Subject to the defendants' exception, one Mrs. Bellows was allowed to testify that she lived near said store, and that, on the night in question, between one and two o'clock, she heard a carriage drive from the square near her house; that she should say that it started from somewhere near the square.

The ground of the exception was that the witness, not having seen the carriage start, could not testify, merely from hearing, as to the place from which it started.

Upon evidence introduced by the State to lay the foundation for secondary evidence of the contents of two registers of hotels in Keene, the court found that said registers having been used as evidence against defendants, before the magistrate, were, a short time before this term, stolen from the court room and destroyed by the defendants, or their agents by their direction, for the purpose of suppressing evidence.

Subject to the defendants' exception, an expert was allowed to testify that certain signatures which he had seen on said registers, and to which he testified before the magistrate, were written by the person who wrote certain other signatures which were produced and proved and admitted to be the signatures of the defendant Shinborn. The ground of the exception was that said registers were not produced and put in evidence.

A register was produced by the State, and proved to be the register of the Island House at Bellows Falls. Upon evidence introduced by the State to lay the foundation for secondary evidence of the contents of a leaf which had been torn from this register, the court found, that, a short time before this term, the leaf had been torn from the register, stolen and destroyed by the defendants, or their agents by their direction, for the purpose of suppressing evidence. Subject to the defendants' exception, an expert was allowed to testify that a signature which he had seen on said leaf before it was torn from the register, was written by the person who wrote certain other signatures which were pro-

duced and proved and admitted to be the signatures of the defendant Shinborn. The ground of the exception was that the foundation was not laid for the comparison of handwritings, by the testimony of any witness who knew Shinborn's handwriting from seeing him write; that the testimony of some witness acquainted with Shinborn's handwriting, and who had seen the signature on the missing leaf, should be intro-duced to show that signature to be in Shinborn's handwriting, and that, without such evidence, the testimony of the expert was inadmissible.

To show that the defendant White hired horses of one Martin, the State offered the book kept by Martin. This book purported to con-tain the daily charges of horses let at Martin's stable. The horses were let by Martin, or his son, or his hired man, and when either of them let a horse he charged it at the time on a slate kept for that purpose; and, every day, Martin or his son copied, from the slate upon the book, the charges made the day before, at the same time erasing them from the slate. They all testified that they could not recollect the transac-tions recorded in the book; that they made the entries on the slate cor-rectly; and Martin and his son testified that they copied the entries from the slate correctly. The defendants objected that Martin and his son should not read in evidence the entries copied by them into the book. The court requested the defendants' counsel to state their objection more specifically and the ground of it, if they could do so, and they stated their objection to be that this was not the right way to prove the books. The court allowed Martin and his son to read the entries copied by them into the book and defendants excepted.

The jury found Shinborn guilty, and disagreed as to White. The court rendered judgment that Shinborn be confined to hard labor for ten years, his counsel objecting that he could be sentenced for no more than five years.

The defendant Shinborn excepted and filed this bill of exceptions which is allowed and signed by the court.

*Lane,* solicitor for the State.

It would seem that if a witness could testify to the movements of a carriage at all from the sound, he might testify that it started or ap-peared to start from a particular point. The knowledge in both cases is derived from the sense of hearing. We gain our knowledge of facts as well from the sense of hearing as of seeing. Both may and sometimes do deceive us; but, for all that, both are relied upon more or less confidently, depending upon circumstances, in all the transactions of life.

The hotel registers were stolen and destroyed by the defendants to suppress evidence, which they contained, against the defendants. It is not objected that the signatures upon the registers were material, but that they cannot be proved to the jury to have been the writing of the defendants without the production of the writings to the jury. We think the rule is not as is claimed. In this case signatures admitted to be genuine were produced in the course of the trial, and were not proved

in for the purpose of enabling the expert to testify as to the genuineness of those on the registers, which he had previously carefully examined.

The question was whether the writings upon the registers were Shinborn's. Handwriting may be proved in three ways :

1. By the person who saw it written.

2. By a person who has seen him write, or has otherwise become familiar with his writing by correspondence.

3. By experts by comparison. Had a person seen Shinborn write his name in the registers, as was the case in one instance, or had a person seen it there, who had become familiar with his writing by correspondence, we suppose there is no doubt he might have testified to the writing after it had been destroyed.

But the operation of the mind in the second place as to identifying the writing as the defendant's, would be the same as that of an expert.

In the former case the person testifies as to its genuineness because it looks like the writing he is familiar with as the defendant's, that is, the witness compares the writing before him with the original as it is impressed upon his mind. This is the only way he can testify. He does not have the original before him ; he has only the disputed writing to look upon and he can only testify by comparison by ; comparing the writing with the recollection or mental impress of the genuine writing as fixed upon his memory.

So in this case with the expert. He becomes master of the genuine writing, as much so, in a legal point of view, as if he had seen it written. This he compares with the destroyed writing as he recollects it, as it is impressed upon his mind ; and the mental operation is precisely the same as if both were before him, for in that case both are not seen the same instant ; the eye is not on both at the same time, but each is necessarily examined separately and the impression made upon the mind by one is compared with the other under immediate inspection. It is not, of course, denied that when both writings are before the expert at the same time, the impress made upon the mind is more recent, more fresh, and may be more distinct, than when one of them is absent, and it may therefore be more satisfactory to a jury. And so it would be when a longer or shorter time had intervened since a person had seen one write his name. But these circumstances do not go to its admissibility, but to the weight to which the jury may think it entitled.

The defendants objected to the use of Martin's books, because the different charges were made upon a slate by different persons, and were transferred daily to the books by Martin and his son, without either of them being able to recollect which of the charges they made upon the slate. These persons, however, all testified that they made the charges upon the slate correctly ; and Martin and his son swear that they copied these charges upon the book correctly. The only difference between this and the common case of testifying from a copy where the original has been lost or destroyed, is that here the same witness cannot testify that he made upon the slate any particular charges which he copied upon the book.

But we think that this fact can make no difference. It takes the tes-

timony of two witnesses to prove a fact where in the common case it takes only one. A swears that he made an original entry which he knew at the time it was made, was true ; and B produces a copy of such entry which he swears he made correctly. And it can make no difference in principle whether this copy is sworn to by A or B. B can copy as correctly as A can, and this is the point to which the question is reduced. Nor can it make any difference that A, B, and C are unable to state what particular entries they made upon the slate, if they made all that were entered upon the slate, and testify that they made them according to the truth, for this establishes the truth of them all. Nor can it be material whether A copied them all upon the books, or A, B or C copied different parts, or that D had copied the whole so long as they testify that they copied them correctly. In either case they each testify to distinct facts.

*Cushing*, for respondent.

I. The witness, Mrs. Bellows, was permitted to state her impression as to the point from which the carriage started, which she heard on the night of the robbery. The general principle certainly is that witnesses are to state what they know. The exception is where the witness is permitted to state his opinion, his judgment, his impression, or his belief. Few things are better known by general experience than the liability to mistake in locating sounds, and we think that the witness's opinion or guess in such a matter is too unreliable to be permitted to go to the jury.

II. One of the modes of proving handwriting is by comparison. In certain cases, juries have been permitted to examine and compare specimens of handwriting which was before them, and to be aided by the opinion of experts. As far as we know, this has never been done, unless the specimens were actually before the jury. And so is the rule laid down in the case of *Reed* v. *Spaulding*. Does the fact found by the court, that the specimens had been destroyed by the fraud of the defendant, alter the practice in this particular? The fact of the fraudulent suppression of testimony might be proved to the jury for the purpose of raising all the presumptions which legally arise in such case. But neither our experience nor our reading furnishes any instance in which the comparison of handwritings has been resorted to unless the writings to be compared were before the jury. We are unable to see any analogy between this case and the common case of laying the foundation for the production of secondary evidence by accounting for the absence of the primary. *Reed* v. *Spaulding*, 42 N. H. 114.

III. In the case of *Bowman* v. *Sanborn*, 25 N. H. 87, the general practice in this State is said to have been not to resort to the introduction of specimens of handwriting merely for purposes of comparison, without first laying the foundation for it by the evidence of witnesses acquainted with the party's handwriting by having seen him write. This

was not done in the case of the register from the Island House. *Myers* v. *Toscan*, 3 N. H. 47.

IV. We have seen no case in which the contents of a book or writing have been made evidence, unless the witness could swear that he knew the entry to be correct when he made it. The case of the books of Mr. Martin was certainly one degree at least removed from that, and it seems to us that the records of the slate are too transient and easy to be altered or erased or varied, to be permitted to be introduced, as was done in that case.

BELLOWS, J.    The admissibility of the testimony of Mrs. Bellows, is substantially settled by the case, *Whittier* v. *Franklin*, Merrimack county, June Term, 1865, where it was decided that it was competent for a witness to state, in respect to a horse at the time he went off a certain bank, that he saw no appearance of fright, that his head was turned round on his side and plaintiff was drawing upon the rein at the time the horse went over the wall, and he did not appear to be frightened in the least before he went off the bank, or afterwards ; that he appeared to be rather a sulky-dispositioned horse to use.

This was held to be admissible on the ground that it came within that class of cases where evidence is received from necessity, arising from the impossibility of stating those minute characteristics of appearance, sound, and the like, which, nevertheless, may lead the mind to a satisfactory conclusion, and be reasonably reliable in judicial investigations. Among instances of this class, forming an exception to the general rule, is the proof of identity in a great variety of cases ; such as the identity of person, handwriting, animals, and inanimate objects ; and so where the identity is detected by the ear, or by the sound of the human voice, of a musical instrument, the discharge of a pistol, and the like. In the same class are opinions as to distances, size, weight and age.

In these and an infinite variety of other cases, the conclusion is drawn from evidence addressed to the eye or ear or both, and which, from its very nature, cannot be described to another. If it could be, so as to enable a jury to decide, then the necessity of receiving the opinion, if it may be so called, would not exist, and the opinion should not be received ; and of this class the proof of value is held to belong in New Hampshire.

In the case before us, no objection is made to the evidence that the sound of a carriage was heard, and none could properly be made ; but the objection is to stating, in substance, from what direction it first came, or from what point the carriage first started ; and the objection is put upon the ground of the liability to be deceived in respect to the place from which the sounds proceed.

Under some circumstances there may doubtless be difficulty in determining that point ; in others there is little or no difficulty in doing so ; and, upon the whole, we think that evidence of this character is so far reliable, as, in general, to deserve the consideration of a jury. In some cases it would, of course, be entitled to but little weight, but the jury

would be well qualified to determine what weight to give it in each case as it may arise.

The same, and perhaps greater, objections might be urged against the proof of identity from the sound of the human voice, and yet in that case, as well as this, from the impossibility of describing its characteristics, there might, for the want of proof of this kind, be a failure of justice.

For the purpose of proving entries upon two hotel registers to have been made by the respondent Shinborn, an expert, who had seen them, was allowed to testify that they were in the handwriting of the person who wrote certain other signatures which were produced and proved, or admitted, to be Shinborn's.

The objection was that these registers were not before the jury, but it being found by the court that they had been destroyed by Shinborn for the purpose of suppressing the evidence, the testimony of the expert was admitted.

In *Bowman* v. *Sanborn & al.*, 25 N. H. 87, it was decided that the signature of a person to an instrument might be proved by the opinion of an expert that it was in the handwriting of the one who made other signatures already in the cause, and not contested, and that it was not necessary that there should have been evidence previously, from a person acquainted with the handwriting in question. If, then, the signature in question is before the court, it may be proved either by the testimony of one acquainted with the handwriting, or by a comparison by an expert with an undisputed signature already in the cause.

If the writing has been lost or destroyed, it may be proved by any witness who has seen it, and is acquainted with the signature in question, even if such acquaintance is derived wholly from having once seen the party write.

So we think that an expert, who has seen such writing and compared it with an uncontested signature in the cause, is competent to prove it when afterwards lost.

It is true, that, in the absence of the paper, the jury have no opportunity for an actual comparison of the handwriting, and thus to test the opinion of the expert; but of this the respondent who has destroyed it ought not to complain; and, besides, in the case of the non-expert who testifies from a knowledge of the party's handwriting, derived from once seeing him write, the signature which he saw made is not ordinarily received for the purpose of comparison; but such witness speaks from a comparison of the signature in question, with the exemplar in his own mind; and the jury have no means of testing the accuracy of his comparison.

In both these cases, then, the jury are equally without the means of testing the opinions of the witnesses by any direct comparison. In each case the opinion of the witness is found from a comparison of the signature in question with, (it may be a single genuine signature,) or an exemplar derived from it, in his own mind; aided, as it may be, in the case of the expert, by a knowledge of those characteristics which indicate the natural or simulated signature.

Upon the testimony of the expert, we think, therefore, that full as much reliance can be placed as on that of the non-expert who has witnessed but a single signature; and such was clearly the opinion of the court in *Bowman* v. *Sanborn & al.*, 25 N. H. 111.

Where a writing is lost, the evidence of its execution must in general be the same as where it is produced, with the exception of what may be derived from comparison; and it surely cannot be urged that any greater strictness shall be required where the instrument is fraudulently destroyed by the maker with a view to the suppression of the evidence.

Against the admission of this evidence we find no authority, and none is cited by the defendants' counsel, unless it may be the case of *Reed* v. *Spaulding*, 42 N. H. 114; and that, we think, was not in point, because there the witness was not an expert, and, besides, the signature, supposed to be genuine, was not in the cause, and that is expressly stated as a ground for excluding the testimony. It is proper to add, also, that the specific exception here is that the books were not produced and no objection was made that the other signatures were not genuine.

For these reasons, we think the opinion of the expert was rightly admitted.

The proof of the entry upon the register of the Island House stands upon much the same footing as the other, although the specific objection here is, that the evidence of a person acquainted with the handwriting was not first adduced.

As we understand the case of *Bowman* v. *Sanborn*, 25 N. H. 111, cited by defendants' counsel, this is entirely unnecessary, and the case of *Myers* v. *Toscan*, 3 N. H. 47, is there examined and qualified, and we think correctly.

The remaining question is whether the entries on the books of Martin, the stable keeper, made by himself and son, were admissible in evidence under the circumstances disclosed.

It appeared that this book contained the daily charges of horses let at this stable; that the entries were first made during the day upon a slate by the said Martin, his son, and a hired man, each of whom entered thereon such horses as he let, and every day these entries were copied by the said Martin and his son upon the book. The correctness of the entries upon the slate was verified by all these parties, and so, also, as to copying them upon the book, by the father and son; but they all testified that they could not remember the transactions so recorded.

We have a case, then, where entries were made in the usual course of business upon the books of a third person, by persons whose duty it was to make them, and who testify to their correctness when made, but who have now forgotten the transactions. This statement, however, is to be qualified by the circumstance that none of the entries were copied into the book by the hired man who may have made the original entry in question.

Independent of this qualification the competency of such entries is well settled. 1 Greenl. Evi. sec. 115, and cases cited; *Bank of Monroe* v. *Culver & al.*, 2 Hill 531; *New Haven County Bank* v. *Mitchel*, 15 Conn. 206. It is also well settled in our own State. *Pillsbury*

v. *Locke*, 33 N. H. 96; *Pembroke* v. *Allenstown*, 41 N. H. 365; *Webster* v. *Clark*, 30 N. H. 245, and *Wheeler* v. *Walker*, not yet reported, Sullivan county, 1864.

We even go further in this State, and hold that a private memorandum made by a person for his own convenience, and not in the usual course of business, but verified by such person upon the stand, may be read in evidence when he has since forgotten the transaction. The leading case to this point is *Haven* v. *Wendell*, 11 N. H. 112, and this has been followed by numerous cases here; and the doctrine must now be considered as established in New Hampshire. Among those cases are *Watson* v. *Walker*, 23 N. H. 471, 495; *Webster* v. *Clark*, 30 N. H. 253; *Tuttle, Admin'r* v. *Robinson*, 33 N. H. 104; see also 2 Cowan Phillips' Evidence, p. 750, n., 528, and cases collected.

The question, then, is, whether the admissibility of these entries is affected by the fact, that, for aught that appears, the horse may have been let to White, and the entry on the slate made by the hired man. It will be observed, however, that he testifies to the correctness of whatever charges he made, in substance that he let the horse as his entry purported. The case, then, is this : Mr. Martin or his son testify that they copied correctly from the slate a charge of a horse to the respondent White ; and they both, together with the hired man, verify the correctness of all their entries upon the slate ; and, of course, if the entry there was made by the hired man, he testifies to the correctness of it; and so it is as to the others. In effect, then, it is much the same as if one person had let the horse and made the charge upon the slate, and another had copied the charge into the book kept for that purpose, and both entries were verified by the person making them.

Upon the whole, we think that this comes within the principle on which such entries are admitted, for it is obviously immaterial whether the entry upon the slate was made by the one who copied it or not; because whoever it was, he had forgotten it, and its value as evidence depended upon the statement that it was correctly made ; and it could make no difference whether that statement was made by the hired man, or the person who copied it. In either case, the entry is verified by the oath of the party making it ; and, on proving it to be correctly transferred to the book, the entry stands substantially as if all was done by the same person.

In *Price* v. *Lord Torrington*, 1 Salk. 285, reported 1 Smith's Lead. Ca. 139, which was assumpsit for beer sold to the defendants, it appeared, that, in the usual way of business, the draymen came every night to the clerk of the brew-house, and gave him an account of the beer they had delivered out, which he set down in a book kept for that purpose, to which the draymen set their names. The drayman who delivered this beer was dead ; but, on proving his signature, the book was held to be good evidence of the delivery. This was admitted upon the ground that it was made in the usual course of business by a person since dead ; although, in fact, the entry was made by another, showing that it is not essential that all should be done by the same person.

In *Pillsbury* v. *Locke*, 33 N. H. 96, a witness testified, that, as he

drew each load of timber, the amount of which was in dispute, he put down upon a slate the amount of each stick, added them up and gave it to his wife or daughter, who entered it in a memorandum book, which he examined, and found the entries correct, but he could not recollect the amount of either load; and the court held the entries to be admissible.

It is true, as suggested by the respondent's counsel, that these entries are one degree removed from those in the cases cited; but still they are in every part verified by the oath of a witness, and come fairly, as we think, within the scope of the doctrine announced in the cases referred to.

The case of *Barker & al.* v. *Haskell*, 9 Cush. 218, is much in point. There the entries upon a slate were made by one plaintiff, and copied into the day book by the other plaintiff, and verified by both; and the books were held to be admissible; and so is *Smith & al.* v. *Sanford*, 12 Pick. 139, and *Faxon* v. *Hollis*, 13 Mass. 427.

The objection to the duration of the imprisonment cannot be maintained, and does not appear to be urged by counsel.

*Exceptions overruled.*